**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JASON AUSTIN, ANTWAN BELCHER, JEFFREY FINLEY, MICHELLE RILEY, TERRENCE SCOTT, TROY DAVIS, and TERRANCE WALKER, | ) ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | 08 CV 5411 |
| The CITY OF CHICAGO, ILLINOIS, a Municipal Corporation, and Chicago Police Officers PATRICK DEENIHAN (#20739), GREGORY JACOBSON, (#20031), MICHAEL KELLY (#21150), MICHAEL CORLETT (#21388), KEVIN BOR (20533), DANIEL GALLAGHER (#21123), PAUL MCDONAGH (#20225), M. KENNEDY (#20102), D. ROBERTS (#20764), G. SWIDEREK (#20130), SANDOVAL (#21302), DAVID GARCIA (#20429), HAMMOND (#21013), ROBERT GLIWA, JR. (#20526), PATRICK THELEN (#21247) and RUSSELL EGAN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Judge Grady<br><br>Magistrate Judge Mason |
| Defendants. | ) | **JURY TRIAL DEMANDED** |

FILED
9/3/2010
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## SECOND AMENDED COMPLAINT

Plaintiffs, JASON AUSTIN, ANTWAN BELCHER, JEFFREY FINLEY, MICHELLE RILEY, TERRENCE SCOTT, TROY DAVIS, and TERRANCE WALKER ("Plaintiffs"), by and through one of their attorneys, Jeffrey B. Granich, make the following complaint against Defendant Chicago Police Detectives, PATRICK DEENIHAN, GREGORY JACOBSON, MICHAEL KELLY, MICHAEL CORLETT, KEVIN BOR, DANIEL GALLAGHER, PAUL MCDONAGH, M. KENNEDY, D. ROBERTS, G. SWIDEREK, SANDOVAL, DAVID

GARCIA, HAMMOND, ROBERT GLIWA, JR., PATRICK THELEN and RUSSELL EGAN

("Defendant Detectives"):

## JURISDICTION and VENUE

1.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiffs' rights as secured by the United States Constitution.

2.      This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.

3.      Venue is proper under 28 U.S.C. § 1391(b). All parties reside in this judicial district and the events giving rise to the claims asserted in this complaint occurred within this district.

## PARTIES

4.      At all times relevant hereto, Plaintiff Jason Austin was a 26 year-old, African-American male resident of Chicago, Illinois.

5.      At all times relevant hereto, Plaintiff Antwan Belcher was a 30 year-old, African-American male resident of Chicago, Illinois.

6.      At all times relevant hereto, Plaintiff Jeffrey Finley was a 23 year-old, African-American male resident of Chicago, Illinois.

7.      At all times relevant hereto, Plaintiff Michelle Riley was a 24 year-old, African-American female resident of Chicago, Illinois.

8.      At all times relevant hereto, Plaintiff Terrence Scott was a 21 year-old African-American male resident of Chicago, Illinois.

9.      At all times relevant hereto, Plaintiff Troy Davis was a 21 year-old African-American male resident of Chicago, Illinois.

10.     At all times relevant hereto, Plaintiff Terrance Walker was 35 year-old African-American male resident of Chicago, Illinois.

11.     At all times relevant hereto, Defendant Detectives, were employed as Chicago police officers, employed by the City of Chicago, acting under the color of the law and within the scope of their employment with Defendant City.

12.     Defendant City of Chicago is a municipal corporation, duly incorporated under the laws of the State of Illinois, and was at all relevant times, the employer and principal of the Defendant Detectives.

## FACTUAL ALLEGATIONS

13.     On August 13, 2008 at approximately 1:30 a.m., Chicago Police Officer Robert Soto and Kathryn Romberg were shot and killed while sitting in Soto's vehicle outside Ms. Romberg's home in the 3000 block of West Franklin Boulevard Chicago, Illinois.

14.     The Chicago Police Department immediately began an investigation into these murders. The police had received information from Officer Soto prior to his death that there were three assailants and a maroon car had fled west after the shooting.

15.     On August 14, 2008 in the late afternoon Plaintiff Michelle Riley was stopped by three Defendant Detectives in the vicinity of Kedzie and Ohio and forced to accompany the Detectives to Area 4 Chicago Police Station located at Harrison and Kedzie.

16.     Plaintiff Riley was questioned for several hours regarding the homicide of Soto and Romberg and subsequently released.

17.     Later in the evening on August 14, 2008 Plaintiff Riley was a passenger in a vehicle when she was again detained by one or more Defendant Detectives. At this time Plaintiff Riley was handcuffed and strip searched on the street by two Defendant Detectives. Plaintiff Riley was subsequently released.

18.     On August 15, 2008 in the early evening hours, Plaintiff Riley was contacted by a Defendant Detective. Plaintiff Riley was told to return to Area 4 Police Station for further questioning regarding the homicide of Soto and Romberg.

19.     Plaintiff Riley, accompanied by her mother, arrived at Area 4 Police Station at approximately 7:00 p.m. on August 15, 2008. Plaintiff Riley was immediately placed in a locked interrogation room.

20.     For the next several hours Plaintiff Riley was interrogated regarding the murders of Soto and Romberg. One or more of the Defendant Detectives demanded that Plaintiff Riley implicate Plaintiff Jason Austin. Specifically, one or more of the Defendant Detectives required that Plaintiff Riley tell them that she had seen Plaintiff Austin driving in a maroon Buick shortly after the shooting on August 13, 2008.

21.     Plaintiff Riley repeatedly informed the officers that she had in fact not seen Plaintiff Austin driving in a maroon Buick on the night of the shootings.

22.     Defendant Detectives began to scream obscenities at Plaintiff Riley while verbally threatening her with physical coercion as well as criminal prosecution if she refused to testify falsely against Plaintiff Austin. Plaintiff Riley again refused to falsely implicate Plaintiff Austin, and the Defendant Detectives left the interview room.

23.     Shortly thereafter, one or more of the Defendant Detectives returned to the interview room and informed Plaintiff Riley that her mother had left the station and could no longer protect her.

24.     One or more of the Defendant Detectives demanded that Plaintiff Riley tell them "What they wanted to hear". Plaintiff Riley again refused to testify falsely.

25.     One or more of the Defendant Detectives then placed Plaintiff Riley's hands behind her back and handcuffed her hands to a steel ring imbedded in the wall of the interview room.

26.     One of the Defendant Detectives then slapped Plaintiff Riley with full force across her face demanding that she implicate Plaintiff Austin.

27.     One of the Defendant Detectives then kicked Plaintiff Riley's legs out from underneath her causing her to fall to the floor and hang painfully from her hands that were chained to the wall. One of the Defendant Detectives repeatedly kicked her legs out from underneath her over an extended period of time demanding that she implicate Plaintiff Austin.

28.     One or more of the Defendant Detectives continued to physically assault Plaintiff Riley until she agreed to their demands to falsely implicate Plaintiff Austin in the murders of Soto and Romberg.

29.     Defendant Detectives contacted the felony review unit of the Cook County State's Attorney's Office in order to memorialize the false statement they had physically coerced from Plaintiff Riley.

30.     Plaintiff Riley ultimately was forced to sign a false statement against Plaintiff Austin implicating him in the murders of Soto and Romberg.

31.     Once Plaintiff Riley had completed memorializing her false statement, she was released from Area 4 Police Station at approximately 3:00 p.m. on August 16, 2008.

32.     Plaintiff Riley was in fact not a witness to the murders of Soto and Romberg nor had she ever committed any criminal act. Nonetheless, Plaintiff Riley was held against her will in Area 4 Police Station for over 20 hours.

33.     On August 14, 2008 Plaintiff Antwan Belcher was at his residence located at 3114 West Franklin Boulevard, Chicago, Illinois. In the early afternoon hours of August 14, 2008, one or more of the Defendant Detectives arrived at Plaintiff Belcher's residence and informed him that he was required to accompany them to Area 4 Police Station regarding the investigation into the murders of Soto and Romberg.

34.     Plaintiff Belcher was taken to Area 4 Police Station and placed in a locked interview room. Plaintiff Belcher was interrogated by one or more of the Defendant Detectives.

4

Plaintiff Belcher denied any knowledge as to the murders and was subsequently released two hours later.

35.     In the early afternoon hours of August 15, 2008, one or more of the Defendant Detectives returned to Plaintiff Belcher's residence and again demanded that he accompany them to Area 4 Police Station.

36.     Plaintiff Belcher was taken to Area 4 Police Station and was placed in a locked interview room.  One or more of the Defendant Detectives began to interrogate Plaintiff Belcher regarding the murders of Soto and Romberg.  Specifically the Defendant Detectives demanded that Plaintiff Belcher implicate Plaintiff Austin in these murders as the driver of a maroon Buick.

37.     Plaintiff Belcher refused to falsely implicate Plaintiff Austin.  In fact, Plaintiff Belcher repeatedly told the Defendant Detectives that Plaintiff Austin was not driving a maroon vehicle that evening, but rather a grey/green minivan.

38.     Defendant Detectives then proceeded to scream obscenities at Plaintiff Belcher and demanded that he implicate Plaintiff Austin as the driver of a maroon vehicle on the night of the shooting.

39.     When Plaintiff Belcher refused to falsely implicate Plaintiff Austin, the Defendant Detectives told Plaintiff Belcher to remove his jewelry and then proceeded to handcuff Plaintiff Belcher to a steel ring imbedded in the wall of the interview room.

40.     While Plaintiff Belcher was chained to the wall, the Defendant Detectives beat him roughly about the head and body.  One of the Defendant Detectives grabbed Plaintiff Belcher by the throat and proceeded to choke him while demanding that he falsely implicate Plaintiff Austin.

41.     After several hours of repeated physical assault, Plaintiff Belcher agreed to falsely implicate Plaintiff Austin.

42.     Defendant Detectives contacted the felony review unit of the Cook County State's Attorney's Office in order to memorialize the false statement they had physically coerced from Plaintiff Belcher.

43.     Plaintiff Belcher was ultimately forced to sign a false statement against Plaintiff Austin implicating him in the murders of Soto and Romberg.

44.     Plaintiff Belcher was in fact not a witness to the murders of Soto and Romberg nor had he ever committed any criminal act.  Nonetheless, Plaintiff Belcher was held against his will in Area 4 Police Station for over 31 hours, during which time he was brutally assaulted.

45. While at Area 4 Police Station Plaintiff Belcher witnessed Defendant Detectives physically assault Plaintiff Riley while she was in an interview room adjacent to his own.

46. In the early morning hours of August 15, 2008, Plaintiff Jeffrey Finley was approaching his sister's home located at 520 North Kedzie, when one of the Defendant Detectives seized Plaintiff Finley, and placed him in handcuffs.

47. Plaintiff Finley was transported to Area 4 Police Station where he was taken to a Police locker room. Once inside the locker room, one or more of the Defendant Detectives placed him face down on a bench located in the locker room and handcuffed his hands with two sets of handcuffs underneath the bench.

48. Plaintiff Finley was immediately punched in the head by one of the Defendant Detectives and thereafter kicked in his shoulder and knocked to the floor while still shackled to the bench.

49. Defendant Detectives began to interrogate Plaintiff Finley regarding the murders of Soto and Romberg. Plaintiff Finley repeatedly told the officers that he was with his brother, Terrence Scott on the night of the shootings and that they had not witnessed the murders of Soto and Romberg.

50. Defendant Detectives demanded that Plaintiff Finley falsely implicate Plaintiff Austin. Specifically, Defendant Detectives wanted Plaintiff Finley to state that his brother, Terrence Scott, was not with him on the night of the shooting, but rather in Plaintiff Austin's maroon Buick during the shooting.

51. Plaintiff Finley repeatedly refused to falsely implicate his brother or Plaintiff Austin in the murders of Soto and Romberg.

52. One of the Defendant Detectives ordered Plaintiff Finley to ball up his fists. The Defendant Detective then proceeded to step on Plaintiff Finley's fists while he was chained to the bench in the police locker room.

53. Thereafter, approximately four of the Defendant Detectives entered the locker room and moved Plaintiff Finley to a different bench in the locker room. These Defendant Detectives then proceeded to physically assault Plaintiff Finley. Specifically one of the Defendant Detectives repeatedly slammed Plaintiff Finley's head against a Police locker while screaming, "Do you know whose locker this is?"

54. Plaintiff Finley was repeatedly physically assaulted by these Defendant Detectives including but not limited to; beaten with fists, kicked, and threatened with deadly force. The Defendant Detectives continued to demand that Plaintiff Finley falsely implicate his brother and Plaintiff Austin in the murders of Soto and Romberg.

55.     Despite the above described physical and verbal assaults, Plaintiff Finley refused to falsely implicate his brother or Plaintiff Austin in the murders of Soto and Romberg.

56.     While at Area 4 Police Station Plaintiff Finley informed an unknown Cook County State's Attorney that he was repeatedly physically assaulted by one or more of the Defendant Detectives during his interrogation.

57.     Plaintiff Finley was ultimately released from Area 4 Police Station at approximately 11:30 p.m. on August 15, 2008.

58.     Plaintiff Finley was in fact not a witness to the murders of Soto and Romberg nor had he ever committed any criminal act.  Nonetheless, Plaintiff Finley was held against his will in Area 4 Police Station for over 15 hours, during which time he was brutally assaulted.

59.     In the early afternoon hours of August 14, 2008, Plaintiff Terrence Scott was stopped in the vicinity of Kedzie and Ohio in Chicago, Illinois by one or more Defendant Detectives.  One or more of these Defendant Detectives told Plaintiff Terrence Scott that he was being arrested for delivering a controlled substance to an undercover Chicago Police Officer. Plaintiff Terrence Scott was taken to the Chicago Police Station located at Homan & Fillmore.

60.     While at this Chicago Police Station, Plaintiff Scott was handcuffed to a bench in an interrogation room and questioned regarding the shooting of Soto and Romberg. Plaintiff Scott informed one or more of the Defendant Detectives that he heard the shooting, but did not see anything.

61.     Subsequent to this interrogation, one or more Defendant Detectives drove Plaintiff Scott around in their vehicle and asked him to identify persons who had possession of controlled substances and/or illegal weapons.  Unable to identify anyone, Plaintiff was eventually taken to the Area 4 Chicago Police Station located at Harrison and Kedzie.  Plaintiff was placed in interview room by one or more Defendant Detectives, was stripped of his clothing, except for his boxer underwear, and was handcuffed to a steel ring imbedded in the wall of the interview room.  Plaintiff remained in this position, standing up until the morning of the following day, August 15, 2008.

62.     At some time in the morning hours of August 15, 2008, one or more Defendant Detectives released Plaintiff Scott from the handcuffs and allowed him to put his clothing back on.

63.     At this time, one or more Defendant Detectives interrogated Plaintiff Scott regarding his knowledge of the murders of Soto and Romberg.  Plaintiff Scott informed the Defendant Detectives that he was with his brother, Jeffrey Finley, on the night of the shootings.  Plaintiff Scott was then left alone in the interview room for at least several hours.

7

64.     Plaintiff Scott was then taken into a different interview room by one or more Defendant Detectives, was stripped of his shirt, and was handcuffed to a steel ring imbedded into the wall of the interview room.

65.     One or more Defendant Detectives proceeded to repeatedly punch and kick with full force Plaintiff Scott repeatedly about his body. One or more of these Defendant Detectives additionally kicked Plaintiff's legs out from underneath him and repeatedly kicked Plaintiff Scott in his groin area. During this assault, Plaintiff Scott repeatedly told the Defendant Detectives that he would voluntarily submit to a polygraph test.

66.     Following this brutal attack, the Defendant Detectives left the interview room, leaving Plaintiff Scott handcuffed in the room alone for a period of time. The Defendant Detectives then came back into interview room, and proceeded to again roughly punch and kick Plaintiff Scott about his body.

67.     Plaintiff Scott repeatedly told these Defendant Detectives that he was telling the truth. The Defendant Detectives left the interview room following this assault. While he was alone in the interview room, Plaintiff Scott heard persons in other interview rooms screaming in pain, whose voices he recognized.

68.     After some period of time one or more of the Defendant Detectives came back into the interview room, upon which Plaintiff Scott informed the Defendant Detectives that he was in severe pain and could not feel his hands.

69.     The Defendant Detectives then told Plaintiff Scott that Plaintiff Michelle Riley had made a statement implicating Plaintiff Jason Austin in the murders of Soto and Romberg. Plaintiff Scott related to the Defendant Detectives that the statement made by Plaintiff Riley was false. The Defendant Detectives continued their assault of Plaintiff Scott by kicking his legs out from underneath him forcing him to fall and hang painfully from his hands that were chained to the wall.

70.     The Defendant Detectives then left the interview room, and returned some time later with a statement from another individual implicating Plaintiff Jason Austin in the murders of Soto and Romberg. Again, Plaintiff Scott informed the Defendant Detectives that the statement was a lie. The Defendant Detectives responded by forcefully and repeatedly banging Plaintiff's head against the wall.

71.     The Defendant Detectives left the interview room again, and come back yet another time with a third statement implicating Plaintiff Jason Austin in the murders of Soto and Romberg. The Defendant Detectives told Plaintiff Scott that if he did not make a statement implicating Jason Austin in the murders of Soto and Romberg that he would never be released from custody and proceed to once again forcefully hit, punch, and kick Plaintiff Scott about his body.

72.     The Defendant Detectives left the room and some time later one of these Defendant Detectives come into the interview room with another Defendant Detective. Plaintiff Scott acquiesced to Defendant Detectives' demands and agreed to give a false statement implicating Jason Austin in order to avoid further physical assault.

73.     One or more of the Defendant Detectives then took the handcuffs off of Plaintiff Scott and allowed him to sleep after giving a false statement to the Defendant Detectives.

74.     One or more Defendant Detectives then ordered Plaintiff Scott to inform Plaintiff Troy Davis, who was in custody at the time, that he was being released from custody as a result of giving a false statement.

75.     Plaintiff Scott was in fact not a witness to the murders of Soto and Romberg not had he ever committed any criminal act.  Nonetheless, Plaintiff Scott was held against his will in Area 4 Police Station for approximately four and one half days, during which time he was brutally assaulted.

76.     On August 15, 2008 Plaintiff Troy Davis voluntarily went to the Area 4 Chicago Police Station located at Harrison and Kedzie with his mother after being informed by several individuals that one or more of the Defendant Detectives wanted to speak with him.

77.     Plaintiff Davis was taken to an interview room and was questioned regarding his whereabouts on the evening of the murders of Soto and Romberg by one or more of the Defendant Detectives.

78.     These Defendant Detectives left the interview room where Plaintiff Davis remained alone for several hours.  The Defendant Detectives came back into the interview room and handcuffed Plaintiff Davis to a steel ring imbedded into the wall of the interview room.  One of the Defendant Detectives threw Plaintiff's right arm, which had been broken approximately a month before, repeatedly against the wall of the interview room.  One of the Defendant Detectives also leaned against the arm with full force causing Plaintiff Davis extreme pain.  The other Defendant Detectives repeatedly and forcefully slapped Plaintiff Davis in the chest.

79.     These Defendant Detectives left the interview for a short period of time, during which Plaintiff Davis heard screaming coming from other interview room.

80.     Shortly thereafter, two Defendant Detectives come back into the interview room interrogated Plaintiff Davis regarding his knowledge of the murders of Soto and Romberg. Plaintiff Davis informed the Defendant Detectives that he had no knowledge regarding the murders of Soto and Romberg.

81.     The Defendant Detectives left the interview room and some time thereafter two Defendant Detectives come into the interview room and again interrogated Plaintiff Davis regarding his knowledge of the murders of Soto and Romberg.  One or more of

9

these Defendant Detectives repeatedly slapped Plaintiff Davis in the face and hit him in the chest with full force, causing him severe pain.

82.     The Defendant Detectives told Plaintiff Davis that if he made a statement saying that he saw a red 2-door car he would be released from custody.

83.     The Defendant Detectives then took Plaintiff Davis out of the interview room and placed him in a different interview room. Plaintiff was then placed in handcuffs attached to steel ring imbedded in the wall of the interview room and forced to remain standing.

84.     One or more of the Defendant Detectives spit on Plaintiff Davis several times and yelled racist and derogatory profanities at Plaintiff Davis.

85.     One or more Defendant Detectives told Plaintiff Davis that if he did not make a statement implicating Plaintiff Austin that he would be charged as an accessory to the murders of Soto and Romberg.

86.     Following this encounter, Plaintiff Davis was moved to a different interview room. Plaintiff Davis remained in this interview room for approximately an entire day.

87.     At some point, two Defendant Detectives entered this interview room and one of the Defendant Detectives read Plaintiff Davis his Miranda warnings. Plaintiff Davis was then informed that he was being charged as an accessory. Plaintiff Davis responded that he wanted to speak with a lawyer.

88.     The Defendant Detectives left the interview room leaving Plaintiff Davis alone for some time. A Defendant Detective came into the interview room and told Plaintiff Davis that he was being charged with two murders and proceeded to fingerprint Plaintiff Davis.

89.     At some point, Plaintiff Davis was taken into another interview room by one or more Defendant Detectives and was shown statements by alleged witnesses. Plaintiff Scott was brought into the interview room and related to Plaintiff Davis that he was being released after giving a false statement implicating Plaintiff Austin in the murders of Soto and Romberg. One of the Defendant Detectives placed handcuffs on Plaintiff Davis and escorted him to a door of the Police Station where he witnessed Plaintiff Scott leave the Police Station. Plaintiff Davis was then taken back into the interview room by one or more Defendant Detectives. At this point, Plaintiff Davis agreed to make a statement implicating Plaintiff Austin in the murders of Soto and Romberg. One or more Defendant Detectives told Plaintiff Davis that his statement had to match that of Plaintiff Scott's. Plaintiff Davis was taken to 26th St. and California and met with an Assistant State's Attorney.

90.     Plaintiff Davis was then taken before a Grand Jury. Plaintiff Davis told this Grand Jury that he was beaten and threatened by the Defendant Detectives into making the

statement. The Assistant States Attorney immediately took him out of the Grand Jury.

91. Following this incident, Plaintiff Davis was threatened with perjury. A different Assistant State's Attorney took Plaintiff Davis before a Grand Jury. Plaintiff Davis then agreed to relate to the Grand Jury the story the Defendant Detectives forced him into making.

92. Plaintiff Davis was in fact not a witness to the murders of Soto and Romberg nor had he ever committed any criminal act. Nonetheless Plaintiff Scott was held against his will in Area 4 Police Station and 26th Street and California for approximately three days, during which time he was brutally assaulted.

93. On or about August 14, 2008 or August 15, 2008, Plaintiff Terrance Walker was parking his mother's vehicle near the 1500 block of Rockwell in Chicago, Illinois. One or more Defendant Detectives asked Plaintiff Walker his name, to which Plaintiff Walker responded honestly, and then ordered Plaintiff Walker to step out of the parked vehicle. Plaintiff Walker was immediately placed into handcuffs by one or more of the Defendant Detectives.

94. Plaintiff Walker was then placed in a Chicago Police vehicle and transported to Area 4 Police Station. Plaintiff Walker was placed into an interview room and one hand was handcuffed to a steel ring imbedded into the wall of the room by one or more Defendant Detectives. One or more of the Defendant Detectives immediately began punching Plaintiff Walker in the jaw and stomach and one or more of the Defendant Detectives additionally kneed Plaintiff Walker in the groin area with great force.

95. One or more of the Defendant Detectives stated to Plaintiff Walker that other witnesses had given statements regarding their knowledge of the murders of Soto and Romberg and that they needed Plaintiff Walker to confirm the statements given by these alleged witnesses.

96. One or more of the Defendant Detectives then proceeded to relate the contents of the statements given by these alleged witnesses. After hearing the statements from the Defendant Detectives, Plaintiff Walker stated to the Defendant Detectives that the statements were not truthful and that he would not make a false statement.

97. Following this encounter, the Defendant Detectives left the interview room. After some period of time, Plaintiff Walker was taken to a different interview room by one or more Defendant Detectives and was handcuffed with both hands behind his back to a steel ring imbedded into the wall of the room. One or more of the Defendant Detectives showed Plaintiff Walker witness statements which implicated Plaintiff Austin in the murders of Soto and Romberg. Plaintiff Walker reaffirmed to these Defendant Detectives that he would not make a false statement. Thereafter one or more of the Defendant Detectives forcefully removed the chair from which Plaintiff

11

Walker was sitting causing him to hang by his wrists from the steel ring to which he was handcuffed, causing him excruciating pain and suffering.

98.     Following this assault, the Defendant Detectives left the room while Plaintiff Walker was still hanging from his wrists from the steel ring. Some time thereafter, the Defendant Detectives re-entered the room and one or more of the Defendant Detectives punched Plaintiff Walker in the jaw.

99.     Plaintiff Walker was then taken to a bathroom by one or more Defendant Detectives and was forced to sit on his knees before the toilet for approximately fifteen to twenty minutes, apparently in an attempt to humiliate Plaintiff Walker. Plaintiff Walker had not requested to use the bathroom.

100.    Plaintiff Walker was then taken to yet another interview room by one or more Defendant Detectives and was handcuffed by one hand to a steel ring imbedded in the wall of the interview room. The Defendant Detectives left the room. A Defendant Detective then came into the interview room, unhandcuffed Plaintiff Walker and took him to the area of the Police Station where arrestees are processed into custody. Plaintiff Walker remained in this area for some period of time before a Defendant Detective took Plaintiff Walker to an interview room.

101.    Plaintiff Walker was handcuffed to a steel ring in this interview room and while one or more Defendant Detectives yelled profanities at him, Plaintiff Walker related to the Defendant Detectives that he still would not make a false statement.

102.    Following this encounter, the Defendant Detectives left the room for some period of time, came back into the room, returned the keys to Plaintiff's Walker's mother's vehicle to him, and released Plaintiff Walker from custody.

103.    Plaintiff Walker was in fact not a witness to the murders of Soto and Romberg nor had he ever committed any criminal act. Nonetheless Plaintiff Walker was held against his will in Area 4 Police Station for approximately one day while he was brutally assaulted.

104.    In the early morning hours of August 16, 2008, Plaintiff Jason Austin was sleeping in his residence located at 548 North LeClaire, Chicago, Illinois.

105.    At this time, Plaintiff Austin was awoken by Defendant Detectives with their guns drawn pointing at his head.

106.    Plaintiff Austin was seized, one of his arms roughly twisted behind his back, and immediately handcuffed in a tight and overly restrictive manner.

107.    Plaintiff Austin was never shown a warrant for his arrest or a search warrant for his residence.

12

108.    Plaintiff Austin was taken to Area 4 Police Station where he was placed in a locked interview room.    When Plaintiff Austin was informed of the circumstances surrounding his arrest, he repeatedly told the Defendant Detectives that he could not have been driving his maroon Buick on the night of the shooting, due to the fact that his car had been taken in for repairs prior to the night of the shooting and was still located in the mechanic's garage the following day.    Plaintiff Austin provided the Defendant Detectiveswith the name of his mechanic as well as the location of the mechanic's garage.

109.    Despite being provided with an alibi and the factual impossibility of Plaintiff Austin driving his maroon Buick on the night of the shooting as well as the knowledge that the statements of Plaintiff Riley and Belcher were false and physically coerced, the Defendant Detectives caused Plaintiff Austin to be charged with the First Degree Murder of Police Officer Soto and Kathryn Romberg.

110.    Thereafter, Plaintiff Austin was taken to Cook County Court House located at 26th and California for a Bond Hearing.

111.    Based on the nature and circumstances of the charges against him, as well as the declared intent by the Cook County State's Attorney's Office to seek the death penalty against him, Plaintiff Austin was denied bond.

112.    On September 10, 2008, after verifying the factual impossibility that Plaintiff Austin had used his maroon Buick in the shooting of Soto and Romberg, the Cook County State's Attorney's Office dismissed all charges against Plaintiff Austin.

113.    Plaintiff Austin was in continuous custody at the Cook County Jail from August 16, 2008 until September 10, 2008 when these false charges were dismissed by the Cook County State's Attorney's Office.

### Count I – 42 U.S.C. § 1983 Unlawful Search and Seizure

114.    Plaintiffs re-allege paragraphs 1 through 113 as if fully repleaded herein.

115.    As more fully described above, Defendant Detectives arrested and searched Plaintiffs without a warrant, probable cause, or any other legal justification to do so, in violation of Plaintiff's rights under the Fourth Amendment to the United States Constitution.

116.    As a direct and proximate result of this false arrest, Plaintiffs suffered damages, including physical and emotional damages, which will be proven at trial.

    **WHEREFORE**, Plaintiff prays for judgment against Defendant Detectives in a fair and just amount sufficient to compensate Plaintiffs for the injuries they have suffered, plus a substantial sum in punitive damages, as well as costs, attorney's fees, and such other relief as is just and equitable.

### Count II – 42 U.S.C. § 1983 – Excessive Force

117.    Plaintiffs re-allege paragraphs 1 through 113 as if fully repleaded

118.    As more fully described in the preceding paragraphs, the intentional conduct of Defendant Detectives toward Plaintiffs was objectively unreasonable under the circumstances, and thus constituted excessive force in violation of the Fourth Amendment to the United States Constitution.

119.    As a direct and proximate result of Defendant Officer's use of excessive force, Plaintiff suffered physical and emotional damages which will be proven at trial.

   **WHEREFORE**, Plaintiff prays for judgment against Defendant Detectives in a fair and just amount sufficient to compensate Plaintiffs for the injuries they have suffered, plus a substantial sum in punitive damages, as well as costs, attorney's fees, and such other relief as is just and equitable.

### Count III – 42 U.S.C. § 1983 – Failure to Intervene

120.    Plaintiffs re-allege paragraphs 1 through 113 as if fully repleaded herein.

121.    During the constitutional violations as described above, one or more of the Defendant Detectives were aware of the misconduct of their fellow Detectives, had a reasonable opportunity to intervene to prevent the harm suffered by the Plaintiffs, but failed to do so.

122.    As a direct and proximate result of this failure to intervene to prevent the violation of Plaintiffs' constitutional rights, Plaintiffs suffered pain and injury, as well as emotional distress.  These Officers had a reasonable opportunity to prevent this harm, but failed to do so.

   **WHEREFORE**, Plaintiff prays for judgment against Defendant Detectives in a fair and just amount sufficient to compensate Plaintiffs for the injuries they have suffered, plus a substantial sum in punitive damages, as well as costs, attorney's fees, and such other relief as is just and equitable.

### Count IV – 42 U.S.C. § 1983 Conspiracy

123.    Plaintiffs re-allege paragraph 1 through 113 as if fully repleaded herein.

124.    Defendant Detectives expressly or impliedly agreed and conspired together to violate the constitutional rights of Plaintiffs, as described more fully above,  in their efforts to solve the murder of a fellow police officer.

125.    As a result of Defendants' conspiracy Plaintiffs suffered physical and emotional damages which will be proven at trial.

WHEREFORE, Plaintiff prays for judgment against Defendant Detectives in a fair and just amount sufficient to compensate Plaintiffs for the injuries they have suffered, plus a substantial sum in punitive damages, as well as costs, attorney's fees, and such other relief as is just and equitable.

## Count V:  *Monell* Policy Claim

126.    Plaintiffs re-allege paragraphs 1 through 125 as if fully repleaded herein.

127.    The constitutional injuries described in the preceding paragraphs were directly caused by the policy, practice and customs of the Defendant City.

128.    Defendant City has exhibited deliberate indifference to the widespread practice of Chicago Police Detectives in violating the constitutional rights of citizens such as Plaintiffs, who were unreasonably detained and physically abused in Defendants' efforts to solve a crime.

129.    The unreasonable detention of witnesses as well as the unconstitutional interrogation techniques described in previous paragraphs has become so widespread as to constitute a custom amongst Chicago police detectives.

130.    Previous lawsuits and similar allegations to Plaintiff's made against other Chicago police detectives have made Defendant City aware of this unconstitutional custom and widespread practice, and yet the City turns a blind eye to it, thus acquiescing to the practice and exhibiting deliberate indifference to it.

WHEREFORE, Plaintiff prays for judgment against Defendant City in a fair and just amount sufficient to compensate Plaintiffs for the injuries they have suffered, plus a substantial sum in punitive damages, as well as costs, attorney's fees, and such other relief as is just and equitable.

## Count VI – False Imprisonment

131.    Plaintiffs re-allege paragraphs 1 through 113 as if fully repleaded herein.

132.    As more fully described above, Defendant Detectives unlawfully seized and detained Plaintiffs without a warrant, probable cause, or any other legal justification to do so.

133.    Defendant Detectives acted willfully and wantonly in that they intended to violate, or were recklessly indifferent towards violating, Plaintiffs' rights.

134.    As a direct and proximate result of Defendant Detectives' misconduct, Plaintiffs suffered physical and emotional damages, which will be proven at trial.

135.   Illinois law provides that public entities, such as Defendant City, are directed to pay any compensatory damages on a tort judgment against an employee who was acting within the scope of his or her employment.

136.   At all relevant times, Defendant Detectives were agents of Defendant City, and acting within the scope of his employment as a Chicago Police Officers.  Defendant City, therefore, is liable as principal for the torts they committed against Plaintiffs.

**WHEREFORE**, Plaintiff prays for judgment against Defendants in a fair and just amount sufficient to compensate Plaintiffs for the injuries they have suffered, as well as such other relief as is just and equitable.

## Count VII – Battery

137.   Plaintiffs re-allege paragraphs 1 through 113 as if fully repleaded herein.

138.   As more fully described above, Defendant Detectives willfully and wantonly and without legal justification, used physical force upon Plaintiff without his or her consent.

139.   As a direct and proximate result of this intentional misconduct, Plaintiffs suffered physical and emotional harm.

140.   Illinois law provides that public entities, such as Defendant City, are directed to pay any compensatory damages on a tort judgment against an employee who was acting within the scope of his or her employment.

141.   At all relevant times, Defendant Detectives were agents of Defendant City, and acting within the scope of his employment as a Chicago Police Officers.  Defendant City, therefore, is liable as principal for the torts Defendant Detectives committed against Plaintiffs.

**WHEREFORE**, Plaintiff prays for judgment against Defendant Detectives and Defendant City in a fair and just amount sufficient to compensate Plaintiffs for the injuries he or she has suffered, as well as such other relief as is just and equitable.

## Count VIII – Intentional Infliction of Emotional Distress

142.   Plaintiffs re-allege paragraphs 1 through 113 as if fully repleaded herein.

143.   As more fully described above, Defendant Detectives' conduct towards Plaintiffs was extreme and outrageous.

144.   Defendant Detectives acted willfully and wantonly in that they intended, or were recklessly indifferent towards, causing Plaintiffs severe emotional distress, knowing

that there was a high probability that their conduct would cause Plaintiffs severe emotional distress and mental anguish.

145. As a direct and proximate result of Defendant Officers' misconduct, Plaintiffs, in fact, suffered severe emotional distress.

146. Illinois law provides that public entities, such as Defendant City, are directed to pay any compensatory damages on a tort judgment against an employee who was acting within the scope of his or her employment.

147. At all relevant times, Defendant Officers were agents of Defendant City and employees of the Chicago Police Department acting within the scope of their employment. Defendant City, therefore, is liable as principal for all torts committed by its agents, Defendant Officers.

   **WHEREFORE**, Plaintiffs pray for judgment against Defendants in a fair and just amount sufficient to compensate them for the injuries they have suffered, and all such other relief as this Court finds just and equitable.

### Count IX—Malicious Prosecution of Plaintiff Austin

148. Plaintiff Austin re-alleges paragraphs 1 through 113 as if fully repleaded herein.

149. Defendant Detectives willfully and wantonly initiated legal proceedings against Plaintiff AUSTIN, and/or caused these legal proceedings to continue against him, without probable cause to do so.

150. With malice, willfulness, and/or reckless indifference to Plaintiff AUSTIN's rights, Defendant Detectives created false and/or inaccurate police reports and/or made false statements to the prosecutor.

151. The legal proceedings against Plaintiff were terminated in his favor, in a manner indicative of innocence.

152. As a direct and proximate result of Defendant Detectives' malicious prosecution, Plaintiff AUSTIN suffered emotional and damages as described in preceding paragraphs, and which will be proven at trial.

153. Illinois law provides that public entities, such as Defendant City, are directed to pay any compensatory damages on a tort judgment against an employee who was acting within the scope of his or her employment.

154. At all relevant times, Defendant Detectives were agents of Defendant City, and acting within the scope of their employment as Chicago police Detectives. Defendant City, therefore, is liable as principal for the torts Defendant Detectives committed against Plaintiff AUSTIN.

   **WHEREFORE**, Plaintiff prays for judgment against Defendants in a fair and just amount sufficient to compensate Plaintiff for the injuries he has suffered, as well as such other relief that is just and equitable.

**Plaintiffs demand trial by jury.**

17

Jason Austin, Antwan Belcher, Jeffrey Finley,
Michelle Riley, Terrence Scott, Troy Davis,
and Terrance Walker,  Plaintiffs,

By:      /s/ Jeffrey B. Granich
         Jeffrey B. Granich

JEFFREY B. GRANICH
Law Offices of Jeffrey B. Granich
53 W. Jackson Blvd.
Suite 840
Chicago, IL 60604
(312) 939-9009
A.R.D.C. No. 6207030